*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DANIEL WHEELER,

        Defendant-Appellant.

UNPUBLISHED
December 26, 2024
2:32 PM

Nos. 366696; 370002
Shiawassee Circuit Court
LC No. 1970-003957-FC

Before: MALDONADO, P.J., and M. J. KELLY and GARRETT, JJ.

PER CURIAM.

In these consolidated appeals, defendant, Daniel Wheeler, asks this Court to review the trial court's decision to resentence him to life imprisonment without the possibility of parole following a remand for resentencing by our Supreme Court in *People v Wheeler*, 510 Mich 1070; 981 NW2d 721 (2022) (*Wheeler V*). Wheeler also challenges the trial court's denial of bail while he awaited resentencing. We hold that the resentencing court erred in its consideration of some of the factors in *Miller v Alabama*, 567 US 460, 489; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and that the factors do not show that Wheeler is the rare juvenile offender for whom a sentence of life without parole is appropriate. Accordingly, we vacate Wheeler's sentence and remand for resentencing to a term of years.

## I. FACTUAL BACKGROUND

In *People v Wheeler*, unpublished opinion of the Court of Appeals, issued January 9, 1995 (Docket No. 126769), pp 1-2 (*Wheeler III*), this Court explained the facts of this case as follows:

> This case stems from the 1970 death of then sixteen-year-old Erlinda Paz, who was defendant's former girlfriend. Paz's body was discovered in a wooded lot in February of that year. Lacerations were present on her scalp and forehead. Additionally, a portion of Paz's scalp, approximately the size of a closed hand, was missing from the back of her head. Tests revealed that Paz, who was two and a half months pregnant, had had sexual intercourse within hours prior to her death. There was no evidence to suggest that Paz had been raped. The medical examiner stated that Paz's injuries were consistent with a highway accident. More specifically, the

-1-

doctor theorized that Paz's scalp could have been loosened by the undercarriage of a traction mechanism or motor vehicle. Alternatively, the medical examiner stated that these injuries could have been caused by a gun barrel with a sharp margin. A shotgun barrel was found in the proximity of Paz's body.

Testimony at trial revealed that Paz had written a letter informing defendant that he was the father of the child that she was carrying. Defendant, who acknowledged that he received the letter, was allegedly upset upon learning that the child was his. One witness who was then a friend of defendant's testified that defendant offered him $10 to hit Paz in the stomach prior to her disappearance and death. Another friend of defendant's, John Ostrander, testified that a few days before Paz was reported missing, defendant told him that he was going to kill her. According to Ostrander, defendant later informed him that he had killed Paz with a gun barrel. Ostrander further testified that defendant asked him to help bury the body. After this request was made Ostrander claimed that defendant drove him to the remote location where Paz's body was eventually discovered. The two men were unable to locate Paz's body on this occasion. Finally, Ostrander stated that defendant asked him to provide a false alibi to the police if and when he was ever questioned about Paz's death

Another friend of defendant's, Rick LaMothe, testified that prior to Paz's disappearance, defendant had taken him to the remote location where her body was eventually discovered. LaMothe claimed to have seen defendant cut the barrel off of a shotgun in January of 1970, approximately one month before Paz's body was discovered. This testimony was corroborated by defendant's mother who testified that defendant had taken a shotgun from the family home and sawed it off. A crime laboratory technician testified that the shotgun barrel found near Paz's body matched the weapon that defendant had sawed off.

Paz's sister, Pearl, testified that she last saw her sister on Friday, January 30, 1970. Pearl stated that the victim informed her before leaving home (between 5:00 or 6:00 p.m.) that defendant was going to pick her up at the corner. Pearl further stated that the victim told her that defendant was "going to show her something" and that he "told her not tell anybody." [Sic.] Defendant's mother testified that defendant left their home by car at approximately 6:00 p.m. on Friday, January 30, 1970. Paz did not return and her family called the police the following day to report her as a missing person.

Janette Bucholz testified that she met defendant between 7:00 and 7:30 p.m. on the same day that Paz disappeared. According to Bucholz, defendant looked "exhausted" when he arrived. Further, Bucholz claimed that defendant had blood stains on his hands and pants. Bucholz said that defendant explained that he had been in a fight with two men. Another woman, Nancy Gerding, heard defendant ask to wash the blood off of his hands. Finally, Gerding said that defendant claimed to have used a pipe to defend himself in the fight with the two men. [*Wheeler III*, unpub op at 1-2.]

On March 24, 1971, a jury convicted Wheeler of first-degree murder, MCL 750.316, for killing Paz when Wheeler was 17 years old. Thereafter, in April 1971, the trial court sentenced Wheeler to serve a mandatory term of life imprisonment without the possibility of parole. Following Wheeler's conviction and sentence, his case was remanded for a competency hearing and later for a *Ginther*[1] hearing. *People v Wheeler*, unpublished per curiam opinion of the Court of Appeals, issued February 24, 2022 (Docket No. 354746) (*Wheeler IV*). Neither hearing resulted in a change to Wheeler's conviction or sentence.

In 2012, the United States Supreme Court decided *Miller*, 567 US 460, in which the Court held that the mandatory imposition of a sentence of life in prison without the possibility of parole on a juvenile offender constitutes a cruel and unusual punishment. The Supreme Court gave *Miller* retroactive effect in *Montgomery v Louisiana*, 577 US 190, 206-209; 136 S Ct 718; 193 L Ed 2d 599 (2016). Thereafter, the prosecutor in this case moved to resentence Wheeler to serve a term of life in prison without the possibility of parole, and the trial court again imposed that sentence on Wheeler.

Wheeler appealed that sentence, and this Court affirmed. *Wheeler IV*, unpub op at 1. But the Michigan Supreme Court reversed *Wheeler IV* on the ground that, in an intervening opinion, *People v Taylor*, 510 Mich 112; 987 NW2d 132 (2022), our Supreme Court held that, at a *Miller* hearing, the prosecutor bears the burden to rebut the presumption that a juvenile sentence of life imprisonment without parole is disproportionate. *Wheeler V*, 510 Mich 1070. Because the resentencing court did not consider Wheeler's sentence within that framework, our Supreme Court vacated Wheeler's sentence and remanded the case to the trial court for resentencing. *Id*.

On remand, although the prosecutor argued that he should be allowed to expand the existing record from the *Miller* hearing because of the burden of proof announced in *Taylor*, he further argued that he did not need to do so in this case, and again asked the trial court to resentence Wheeler to life imprisonment with the possibility of parole. While awaiting resentencing, at a hearing in June 2023, Wheeler requested bail under MCL 770.9a, and argued that clear and convincing evidence from the *Miller* hearing established that he would not pose a danger to others. The trial court denied Wheeler's motion on the ground that a defendant convicted of first-degree murder must be committed to the Michigan Department of Corrections (MDOC) while awaiting sentencing.

Thereafter, the trial court concluded that expansion of the record of the *Miller* hearing was unwarranted because neither party requested it and the existing record was sufficient. The trial court asked Wheeler to address the *Miller* factors in his brief and he incorporated the arguments made at the previous *Miller* hearing, addressed updated caselaw, and argued that the *Miller* factors supported a lesser sentence than life in prison without the possibility of parole. The trial court ultimately ruled that the prosecutor rebutted the presumption that a lesser sentence was warranted and again sentenced Wheeler to serve a term of life imprisonment without the possibility of parole, with credit for 19,658 days served. In Docket No. 366696, defendant appeals by leave granted the

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 992 (1973).

trial court's decision denying him bail,[2] and, in Docket No. 370002, defendant appeals as of right the trial court's sentencing decision.

## II. DENIAL OF BAIL

Wheeler contends that the trial court erred when it denied bail pending resentencing. We decline to address this issue because we hold that this argument is moot.

Our courts decide actual cases and controversies and will not decide moot issues. *People v Richmond*, 486 Mich 29, 34; 782 NW2d 187 (2010), amended 486 Mich 1041 (2010). Wheeler asked to be released on bail while he awaited resentencing but, because Wheeler was resentenced, the matter of his entitlement to bail is no longer a justiciable claim. Wheeler did not file a supplemental brief or a motion to expedite the appeal before the trial court resentenced him, and he has not shown that this involves a legal issue that "is one of public significance that is likely to recur, yet evade judicial review." *Id*. Further, although Wheeler's point is well-taken that, because he was 17 years old when he committed the crime, MCL 750.316 does not apply to him, we will not rule on the trial court's denial of bail because we can offer him no remedy through remand for a determination of whether Wheeler should otherwise be granted bail. Accordingly, we decline to rule on the merits of Wheeler's claim in Docket No. 366696.

## III. SENTENCING

## A. STANDARDS OF REVIEW

This Court reviews for an abuse of discretion the trial court's decision to sentence a juvenile to serve life in prison without parole. *People v Taylor*, 510 Mich at 128. "[A] given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Skinner*, 502 Mich 89, 131-132; 917 NW2d 292 (2018) (quotation marks and citation omitted; alteration in original). An abuse of discretion occurs when the trial court's outcome falls outside the range of principled outcomes. *Id*. at 133.

This Court reviews the trial court's underlying factual findings at a *Miller* hearing for clear error. *Taylor*, 510 Mich at 128. "A finding is clearly erroneous if, after reviewing the entire record, this Court is definitely and firmly convinced that the trial court made a mistake." *People v Swenor*, 336 Mich App 550, 563-564; 971 NW2d 33 (2021). This Court reviews de novo issues of constitutional law. *Taylor*, 510 Mich at 128. Generally, this Court reviews de novo the trial court's application of law. *People v Armstrong*, 344 Mich App 286, 294; 1 NW3d 299 (2022). When this Court engages in de novo review, this Court reviews the issue without deference to the lower court. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

---

[2] *People v Wheeler*, unpublished order of the Court of Appeals, issued September 18, 2023 (Docket No. 366696).

B.  LEGAL CONSIDERATIONS

As discussed, in *Miller*, the United States Supreme Court held that mandatory sentences of life imprisonment without the possibility of parole for juvenile offenders is an unconstitutionally cruel and unusual punishment. *Taylor*, 510 Mich at 126. The prosecution must present clear and convincing evidence to rebut the presumption that a sentence of life imprisonment without the possibility of parole is a disproportionate sentence. *Id*. at 129. Clear and convincing evidence is "evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *People v Williams*, 228 Mich App 546, 557; 580 NW2d 438 (1998) (cleaned up).

As our Supreme Court explained in *Taylor*, 510 Mich at 126-127:

While the Supreme Court declined to categorically ban juvenile LWOP sentences for homicide convictions, it reasoned that the "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Miller*, 567 US at 479. "That is especially so because of the great difficulty . . . of distinguishing at this early [age] between the 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Id*. at 479-480, quoting *Roper* [*v Simmons*, 543 US 551, 773; 125 S Ct 1183; 161 L Ed 2d 1 (2005)], and citing *Graham* [*v Florida*, 560 US 48, 68; 130 S Ct 2011; 176 L Ed 2d 825 (2010).]

A few years later, the Supreme Court held that *Miller* would be applied retroactively. *Montgomery*, [577 US 190]. In that case, the Supreme Court reiterated that, while *Miller* did not foreclose a sentencer's ability to sentence a juvenile to LWOP, "a lifetime in prison is a disproportionate sentence for all but the rarest of children" and is reserved for those "whose crimes reflect irreparable corruption." *Id*. at 195, 136 S Ct 718 (quotation marks and citations omitted). Most recently, in *Jones v Mississippi*, 593 US [98]; 141 S Ct 1307; 209 L Ed 2d 390 (2021), the Supreme Court concluded that a factual finding of permanent incorrigibility was not constitutionally required before imposing an LWOP sentence on a juvenile offender. *Id*. at [106], [113]. Even so, that decision "carefully follow[ed] both *Miller* and *Montgomery*" and reconfirmed that juvenile LWOP should be "relatively rare." *Id*. at [112], [119].

Sentencing courts must "start from the premise that the juvenile defendant before them, like most juveniles, has engaged in criminality because of transient immaturity, not irreparable corruption." *Taylor*, 510 Mich at 135. There is no specific fact that a prosecutor must prove to establish that a sentence of life imprisonment without the possibility of parole is appropriate, but a prosecutor must prove facts and circumstances that rebut the presumption against life imprisonment without parole, and the trial court must consider, justify, and weigh the competing interests to determine which predominates. *Id*. at 134-136.

In *Miller*, "[t]he Supreme Court set forth circumstances that a trial court should consider before concluding that it is appropriate to sentence a juvenile offender to die in prison." *Id*. at 126. As our Supreme Court further explained in *Taylor*:

Those *Miller* factors are: (1) the juvenile's chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile's family and home environment—from which he cannot usually extricate himself—no matter how brutal or dysfunctional; (3) the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him; (4) the incompetencies of youth, which affect whether the juvenile might have been charged with and convicted of a lesser crime, for example, because the juvenile was unable to deal with law enforcement or prosecutors or because the juvenile did not have the capacity to assist their attorney in their own defense; and (5) the juvenile's possibility of rehabilitation. [*Id*. (quotation marks and citation omitted.)]

At a *Miller* resentencing, the court must consider these factors and any other relevant criteria, "including the individual's record while incarcerated." MCL 769.25(6). The resentencing court may also consider "the traditional objectives of sentencing—punishment, deterrence, protection, retribution, and rehabilitation." *People v Garay*, 506 Mich 936, 936-937; 949 NW2d 673 (2020). Further, the trial court must keep in mind that all of the *Miller* factors are mitigating factors. *Taylor*, 510 Mich at 139 n 25. "If a particular *Miller* factor does not militate against [life without parole], for example, at most that factor will be considered neutral." *Id*. The trial court may not consider *Miller* factors as aggravating factors that favor a sentence of life without parole. *Id*.

In *People v Bennett*, 335 Mich App 409, 420; 966 NW2d 768 (2021), this Court observed the differences when applying the *Miller* factors to a juvenile offender being sentenced for the first time versus evaluating the sentence of an adult who was first sentenced to life without parole as a juvenile:

The focus of the analysis necessarily shifts when a court considers an appropriate sentence for an adult who was sentenced to a lifetime of imprisonment for a crime committed as a juvenile. While sentencing a young person, a judge looks forward and endeavors to predict the future. *Miller* counsels that a careful examination of the offender's developmental characteristics, his or her family environment, and the circumstances surrounding the crime help guide a determination of whether that child will ever be capable of change. Resentencing an adult requires restructuring the evidentiary review; the older the adult, the larger the predictive canvas becomes. While the *Miller* factors remain highly relevant, a judge resentencing an offender who has served many years in prison has the benefit of actual data regarding whether the offender's life in prison is truly consistent with "irreparable corruption," the only ground *Miller* specifically identified for imposing a life-without-parole sentence. See *Miller*, 567 US at 479-480.

At a *Miller* hearing, the sentencing court is not engaged in a fact-finding mission. *Taylor*, 502 Mich at 136. Rather, the trial court must only consider all the evidence before it when determining whether to impose a sentence of life without parole. *Id*. at 135. In this case, as well as the evidence provided at the *Miller* hearing, the evidence before the court included the trial itself and the numerous other hearings that took place during this case.

## C. *MILLER* FACTORS AND WHEELER'S RESENTENCING

Wheeler argues that the trial court clearly erred by finding the *Miller* factors neutral instead of mitigating. We hold that the resentencing court's finding that each factor had neutral weight was clearly erroneous.

Wheeler argues that the prosecutor's proofs were insufficient because he failed to introduce evidence. We disagree. The evidence presented at the *Miller* hearing is not the only evidence that the trial court may consider when sentencing a defendant. See *Taylor*, 502 Mich at 135. Further, cross-examination of expert witnesses may be sufficient to show the defects in the expert's opinion. *People v Carll*, 322 Mich App 690, 702; 915 NW2d 387 (2018). In this case, the prosecution presented evidence at defendant's trial regarding the facts and circumstances of the crime, which this Court has previously recited in great detail. The prosecution's explicitly stated strategy at the *Miller* hearing was to cross-examine defendant's witnesses, and the prosecution did so.

### 1. HALLMARK FEATURES OF YOUTH AND FAMILY ENVIRONMENT

Following the *Miller* hearing, the trial court considered Wheeler's age and its hallmark features. A defendant's youth factors into the trial court's four basic sentencing considerations, which are "(1) reformation of the offender; (2) protection of society; (3) disciplining of the wrongdoer; and (4) deterrence of others from committing like offenses." *People v Boykin*, 510 Mich 171, 188; 987 NW2d 58 (2022) (quotation marks and citation omitted). However, the trial court need not articulate how defendant's youth affects these general sentencing criteria. *People v Copeland*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 363925); slip op at 4.[3]

The trial court found that Wheeler's age weighed against a sentence of life without parole and that Wheeler, as a youth, "was generally reckless and impulsive" but that his immaturity, recklessness, and impulsiveness were not mitigating because the crime was premeditated. The trial court observed that, after Wheeler learned about Paz's pregnancy, he attempted to pay a friend $10 to hit Paz in the stomach, he told another friend that he was going to kill Paz, and he later asked for help burying her body. *Wheeler III*, unpub op at 1. Wheeler also asked his friend to provide him with a false alibi. Another friend testified that he witnessed Wheeler saw off the barrel of a shotgun. *Id.* at 2. Although Wheeler was a juvenile when he committed the crime, these facts do demonstrate premeditation, which is present in first-degree murders, and the resentencing court apparently concluded that this premeditation rendered Wheeler's youth irrelevant.

---

[3] Like the defendant in *Copeland*, Wheeler appears to assume that an improperly weighed *Miller* factor renders the defendant's ultimate sentence disproportionate. See *Copeland*, ___ Mich App at ___ & n 4; slip op at 7 & n 4. This Court has stated that this "seems like a safe assumption considering that the intent of a trial court's on-the-record articulation of the *Miller* factors in this context is to enhance appellate review of the proportionality of the resulting sentence. *Id.* at ___ n 4; slip op at 7 n 4." We make the same assumption here.

The record reflects that the resentencing court clearly erred by failing to consider Wheeler's youth a mitigating factor. Contrary to the trial court's holding, evidence showed that Wheeler's conduct was based on a wholly immature and reckless reaction to learning that Paz was pregnant, a fact that triggered the most extreme decision that, to avoid responsibility, Wheeler needed to end the pregnancy through violence toward Paz. That Wheeler engaged in forethought and attempted to hide the crime after he committed it did not negate that Wheeler acted with reckless immaturity in response to learning he might be a father.

We are troubled that the resentencing court described Wheeler as "generally reckless and impulsive," except for his conduct in committing the crime, when Wheeler's youthful attributes are of paramount importance in a *Miller* decision. This is particularly perplexing when psychiatric records from around the time of Wheeler's crime referenced his emotional instability, and described him as "immature and overwhelmed by his impulses," acting in "highly impulsive, quickly reactive, emotional way[s]," "prone to tensions, impulsive actions, and attention-getting behavior when under pressure," and that that his youth rendered him less capable of considering alternatives. Indeed, forensic psychologist Dr. Carole E. Holden reported that the marks of psychological immaturity, impulsivity, and an inability to appreciate the consequences of his conduct "were particularly prominent" in Wheeler's personality when he committed the crime. She further opined:

> In summary, at the time of the murder, Mr. Wheeler was impulsive and emotionally overactive ("hysterical"), even compared to other late adolescents. He was immature: his social and emotional adjustment lagged behind that of his peers, making him particularly vulnerable to negative peer influences. He abused alcohol and, especially, inhalants, significantly contributing to his difficulty modulating his emotions and impulses.

In light of this evidence, the resentencing court's failure to consider mitigating the pronounced features of Wheeler's adolescent personality at the time of the crime was clearly erroneous.

The resentencing court considered Wheeler's claims of an abusive home life and found that the claims were not credible. The court noted that Wheeler did not present evidence of physical abuse in his first presentence investigation report (PSIR) in 1971 and the court concluded that Wheeler raised the issue of physical abuse in his childhood home for the first time at the *Miller* hearing.

Dr. Holden reported that, in 2017, Wheeler disclosed in preparation of his *Miller* hearing that he was sexually abused when he was 12 or 13 years old, which was something Wheeler did not disclose to anyone at the time because of his feelings of humiliation. Wheeler also reported to Dr. Holden that he lived in his car after he dropped out of school when he was 14 years old. However, in his initial PSIR, Wheeler reported that he consistently lived at home, except for a one-week stay in a hotel. The trial court found that Wheeler's claims were self-reported, that they were not corroborated by independent evidence, and that other evidence seemed to contradict them. The court also considered that Dr. Holden did not have personal knowledge of Wheeler's home life and that the reliability of Wheeler's memory was questionable.

The sentencing judge is permitted to make credibility determinations. See *Skinner*, 502 Mich at 135. We are not definitely and firmly convinced that the trial court made a mistake when it found that Wheeler's home life was a neutral factor, and the court's factual findings were not clearly erroneous. Wheeler argues that his school report card provided independent evidence that corroborates his claim of suffering trauma because his grades declined. However, Wheeler previously indicated that he dropped out of school because he wanted to stay at home and work on cars or because he did not get along with classmates, so other circumstances could arguably explain Wheeler's declining grades at that time.

Further, in Wheeler's initial PSIR, defendant described good relationships with his parents and all but one of his siblings. In an affidavit for the *Miller* hearing, Wheeler's brother described their mother as "a good, caring, special person who was always trying to help somebody" and described his parents as instilling a good work ethic. Testimony from Wheeler's *Ginther* hearing established that his mother and father were involved in Wheeler's defense at trial. We conclude that the trial court did not clearly err by finding that other evidence weighed against Wheeler's later descriptions of his home life.

Defendant also argues that the court made credibility determinations despite stating that it could not assess Wheeler's credibility. We hold that Wheeler's argument takes the trial court's ruling out of context, which a reviewing court will not do. *People v Lanzo Constr Co*, 272 Mich App 470, 479; 726 NW2d 746 (2006). The resentencing court indicated that it did not find Wheeler's claims credible because he was presenting new, self-reported evidence that was contradicted by other evidence. Regarding Wheeler's statements to his forensic psychologist, the court noted that she lacked personal knowledge of the facts, and the court could not assess Wheeler's credibility. The court stated that it did not distrust Dr. Holden, but was "not inclined to outsource its credibility determinations to a third party." The court also found that the reliability of Wheeler's memory was questionable because he claimed memory loss. In context, the court's findings were not contradictory.

## 2. CIRCUMSTANCES OF THE OFFENSE

The trial court considered the circumstances of the offense and external pressures and determined that they were not mitigating factors. The court compared Wheeler's conduct to the defendants in *Miller*, and concluded that Wheeler's conduct against Paz was more egregious and that external factors did not affect his decision-making. However, many of the court's findings are not supported by the record. Paz's letter announcing her pregnancy stated that Wheeler should marry her, pay alimony, or go to jail. Although Wheeler's mother testified twice at trial that she would support the child, in both instances her testimony made clear that she made the statement to Wheeler the day after Paz went missing, so her offer of support had no bearing on the crime. Although Wheeler told Dr. Holden that many men in his family married because of an out-of-wedlock pregnancy, he stated that he had no memory of committing the crime or what could have motivated him to do so. In light of the evidence from around the time of the crime that Wheeler was recklessly immature, emotionally reactive, overdramatic, and impulsive, it was clearly erroneous for the trial court to find that the consequences of his sexual relationship—his responsibility for a pregnancy—did not constitute an external factor that impacted Wheeler's decision-making.

Wheeler also argues that the trial court did not comprehend that this the factor should include Wheeler's use of inhalants and alcohol, and a psychiatric episode in prison. We agree. The *Miller* Court explicitly considered that Miller regularly used drugs and alcohol and that he attempted suicide. *Miller*, 567 US at 467. Evidence regarding a juvenile's emotional disturbance may be particularly relevant in a case involving a juvenile offender. *Id*. at 476. Although we recognize that a resentencing court need not engage in any specific fact-finding at a *Miller* hearing, *Taylor*, 510 Mich at 134, the court plainly ignored substantial evidence of Wheeler's use of inhalants, alcohol, and drugs. Evidence at the time of the crime indicated that Wheeler's use of inhalants increased after the age of 16 which led to erratic conduct and lapses in memory. Dr. Holden further stated that chronic inhalant use is associated with "amnesia, disinhibition of impulses, and over time, brain damage." Although the record does not disclose whether and to what extent Wheeler's alcohol, drug, and inhalant use may have caused brain damage by the time he committed the crime, the record is replete with evidence that he used inhalants and other substances that impacted his behaviors. Accordingly, we are left with a firm conviction that the resentencing court erred by failing to consider Wheeler's use of inhalants, alcohol, and drugs, as having some mitigating impact on the crime he committed as a juvenile offender.

### 3. NAVIGATION OF THE COURT SYSTEM

The fourth *Miller* factor addresses Wheeler's navigation of the court system and whether Wheeler may have been charged with or convicted of a lesser offence were it not for "incompetencies associated with youth." *Miller* 567 US at 477-478. The court noted that Wheeler's youth could have affected his decision to go to trial and that a more mature client likely would not have been so obstructive to his attorney. But the court also found that Wheeler maintained his innocence and the evidence against him was overwhelming. For that reason, the resentencing court found that the factor was neutral because additional maturity would not have affected the outcome of his trial.

We disagree with the trial court's finding that this factor was not mitigating when record evidence showed that Wheeler's youthful incompetence and inexperience with the legal system led to his life-without-parole sentence. Wheeler had no criminal history before the murder, and thus had no experience navigating the legal system. The record reflects that Wheeler was not only obstructive with his attorney, but often largely uncommunicative with him. Further, at Wheeler's *Ginther* hearing, his former counsel testified that Wheeler was offered the opportunity to plead guilty to second-degree murder, but rejected it despite counsel's strong recommendation that he accept the plea bargain. Under the circumstances, even if the evidence against Wheeler was overwhelming, it is clear that Wheeler's transient immaturity and rashness undoubtedly prevented him from accepting the plea to a lesser offense. Because the trial court also recognized these facts and noted that, had he been more mature, he would have accepted the plea, we are convinced that the court made a mistake by concluding that Wheeler's youthful incompetency in navigating the justice system was not a mitigating factor.

### 4. POSSIBILITY OF REHABILITATION

The trial court considered the possibility of Wheeler's rehabilitation and did not find his prison record to be mitigating. Again, we have a definite and firm conviction that the trial court made a mistake because Wheeler's record over decades is utterly inconsistent with irreparable

corruption. In its ruling on this *Miller* factor, the trial court adopted the rationale of its prior decision, in which it acknowledged that Wheeler's prison record improved over time and that his record included a wealth of positive evaluations and impressions. But the trial court heavily relied on a misconduct Wheeler received in January 2018 for having in his cell a handmade miniature table saw for cutting popsicle sticks for crafts. The trial court was not concerned about the saw itself, but apparently concluded that, because Wheeler committed the violation during the time he was being considered for resentencing, Wheeler's personality traits that may have led to his criminality were not transitory.

We are again convinced that the trial court clearly erred. Record evidence showed that the miniature saw, a crafting tool, did not change Wheeler's security level at the prison, which remained at the lowest level possible for his conviction. Further, although saws and other tools are generally prohibited in Wheeler's prison, it was also common for staff to ignore or tolerate their possession so that prisoners could do repairs or other projects. Most importantly, however, the overwhelming majority of Wheeler's prison record shows that Wheeler is not irreparably corrupt, which is the ground the *Miller* Court identified for imposing a life-without-parole sentence.

Wheeler's prison record shows a sharp decrease in misconduct and problematic behavior after his 20s as well as a long list of achievements and wide-ranging praise. Over a period of 50 years, Wheeler worked as a handyman, facility maintenance worker, electrical apprentice, and a plumber's helper. Wheeler obtained certificates of completion in Core Curriculum for Craft Training, Electrical Lead One, and Food Protection, and he became a certified mechanic and achieved honors in creative arts and hygiene programs. Wheeler regularly used and had access to power tools in his jobs, including power tools, knives, saws, and screwdrivers while working and his bosses commended him for his work and his conduct. The electrician for whom Wheeler worked for eight years described Wheeler as his "top guy," and he trusted Wheeler with all tools, which was not true of other prisoners. Prison records also describe Wheeler as a "model inmate," positive, and reliable.

Further, at Wheeler's *Miller* hearing, a former prisoner testified that Wheeler watched over him when he entered prison in 1986. Wheeler taught him skills, advised him how to avoid troubling or dangerous inmates, and helped him obtain his GED. The prisoner credited Wheeler's guidance for helping him to obtain an early release from prison for good behavior and in encouraging him to get a good job after his release. Indeed, although Wheeler's life-without-parole sentence prevented Wheeler from being considered for release, he helped others take steps toward that goal.

MDOC specialist Richard Stapleton testified that Wheeler's last Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) assessment reflected a low violence risk and a low recidivism risk. Although the MDOC did not officially score prisoners serving life, as Stapleton scored Wheeler, he would be considered a prisoner with a high probability of parole. Moreover, in Dr. Holden's opinion, Wheeler is not irreparably corrupt and his prison record demonstrates his rehabilitation. Again, we are definitely and firmly convinced that the trial court made a mistake when it found that Wheeler's immaturity was not transient when, over decades, he demonstrated an immense capacity for rehabilitation.

-11-

Pursuant to *Miller*'s substantive rule of constitutional law, sentencing courts are now required to consider diminished capacity and a juvenile offender's ability to change before resentencing him to life in prison without parole, keeping in mind that a life-without-parole sentence is disproportionate for the vast majority of juvenile offenders. *Montgomery*, 577 US 212. Contrary to the assertions of our dissenting colleague, we seek here not to reweigh evidence, but to show that, with regard to some *Miller* factors, record evidence plainly contradicted the trial court's finding that no factor had any mitigating value. At the very least, the prosecutor did not rebut the presumption by clear and convincing evidence that a life-without-parole sentence was disproportionate when, over the span of 50 years since his commission of this terrible crime, Wheeler showed an ability to reform such that it would be manifestly unjust to deem him irreparably corrupt.

Ultimately, the trial court's resentencing analysis was flawed because it did not begin with the presumption, as required by *Miller* and *Montgomery*, that Wheeler's life-without-parole sentence was disproportionate. The heinousness of the crime itself must be considered with record evidence that Wheeler committed and was tried for it at a time when he was demonstrably immature, impetuous, and emotionally reactive, when faced with the consequences of an unplanned pregnancy, and also in light of a plethora of evidence showing Wheeler's record of verifiable rehabilitation. The record before us shows a youthful offender who committed a heinous crime before the age of 18, but who was not irredeemably depraved, but one who could, and did, grow into a responsible, contributing adult. Because we hold that the prosecutor did not rebut the presumption that Wheeler's life-without-parole sentence was disproportionate in light of the *Miller* factors, we hold that the trial court abused its discretion by again sentencing Wheeler to life imprisonment with the possibility of parole. Accordingly, we vacate Wheeler's sentence and remand for resentencing to a sentence for a term of years consistent with MCL 769.25(9).

## IV. RESENTENCING BEFORE A DIFFERENT JUDGE

Wheeler contends that his case should be remanded to a different judge because of delays and the trial court's unresponsiveness to defense counsel.

A judge must be disqualified when the judge cannot decide a case impartially. MCR 2.003(C). But there is a heavy presumption in favor of judicial impartiality. *Cain v Dep't of Corrections*, 451 Mich 470, 497; 548 NW2d 210 (1996). To determine whether resentencing before a different judge is required on remand, we examine the following factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. [*People v Walker*, 504 Mich 267, 285-286; 934 NW2d 727 (2019).]

Wheeler argues that the trial court's erroneous denial of his motion for bail establishes that remand before a different judge is warranted. However, judicial rulings form the basis for a claim

-12-

of judicial bias only when those rulings show a deep-seated favoritism or antagonism, which is not evidenced in the record. *People v Willis*, 322 Mich App 579, 590; 914 NW2d 384 (2018).

Wheeler also claims that the trial court's delay and unresponsiveness support the conclusion that reassignment is necessary to preserve the appearance of justice. The party seeking reversal on appeal has the burden to provide the court with a record that establishes the factual basis of his or her argument. *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). When considering issues of bias, courts operate on a subjective standard rather than attempting to step inside the mind of a lower-court judge. *Cain*, 451 Mich at 511.

There is no evidence in the record to support that the delay in Wheeler's case was abnormal or deliberate. Defendant states that he contacted the prosecution and trial court many times, but there is no factual support for this argument. Further, Wheeler provided timelines without any factual context or comparison to other, similar cases before the same trial court. Without any record, there is simply no way to determine whether the delay in Wheeler's case is contrary to the appearance of justice or related to some other reason.

We also hold that the cases Wheeler cites do not support his arguments. In *Walker*, 504 Mich at 286, remand before a different judge was warranted when the judge personally insulted and baited the defendant by calling him a clown and a coward. In *People v Evans*, 156 Mich App 68, 71; 401 NW2d 312 (1986), the court stated that the defendant's sentence would be the same regardless of whether counsel was present. And in *People v Crook*, 123 Mich App 500, 504; 333 NW2d 317 (1983), this Court remanded for resentencing before a different judge using an updated PSIR, but the court's reasons for doing so were unclear. See *id*. at 503-504.

In this case, the trial court did not insult Wheeler or decline to consider his claims. Although we disagree with the trial court's analysis, the court appears to have carefully considered the evidence and even asked Wheeler to further brief the issues to fully address the *Miller* factors. Further, there is no indication that the trial court cannot reasonably be expected to set aside previously expressed views. See *Walker*, 504 Mich at 285-286. And, considering the extensive factual and procedural history in this case, the amount of time that a new judge would require to become sufficiently familiar with the case to decide it strongly weighs against remanding for consideration before a different judge. Accordingly, we decline to remand the case to a different judge.

For the reasons stated, we vacate Wheeler's sentence of life imprisonment without the possibility of parole and remand for resentencing to a term of years. Resentencing must occur within 56 days. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Kristina Robinson Garrett